BOARD OF COMMISSIONERS OF the
PORT OF NEW ORLEANS

v.

M/V AGELOS MICHAEL, in rem, and
Christopolin Compania Navigacion, S.
A., in personam.

Civ. A. No. 73–1307.

United States District Court,
E. D. Louisiana.

June 13, 1974.

Ronald A. Johnson, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for plaintiff.

Harvey G. Gleason, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for defendants.

## OPINION

BOYLE, District Judge:

The plaintiff sues for recovery of a stipulated amount of damages ($21,276.-01) representing the cost of repairs to a gantry crane, located at its bulk terminal facility on the Mississippi River Gulf Outlet in the Port of New Orleans, made necessary by collision of a boom of the M/V AGELOS MICHAEL with the crane during docking of the vessel on the morning of May 16, 1973.

The plaintiff contends that this situation calls for the presumption of fault against a moving vessel which collides with a fixed object and, therefore, the burden is upon the vessel and its owner to show not only that probably his fault did not contribute to the collision but that it could not possibly have done so. It is also contended by the plaintiff that the port booms were not properly inboard the port gunwale of the vessel; that the pilot aboard the vessel had previously docked many ships at the Dock Board facility; that under the circumstances the members of the crew of the vessel did not exercise proper care while docking on this occasion; that the vessel was proceeding at an excessive rate of speed without a proper lookout; that none of plaintiff's personnel were negligent and, finally, that the defendants had the last clear chance to avert the damage.

The defendants contend that the overhang of the control cab and its supports over the navigable waters of the Mississippi River Gulf Outlet was an obstruction to navigation and a clear violation of 33 U.S.C. § 403 which prohibits such obstructions, unless affirmatively authorized. The defendants further contend that a wharfinger has a duty to exercise reasonable care in ascertaining conditions of berths at its wharf and a duty to remove dangerous obstructions or give notice of existence thereof to vessels about to use the berths. The sole proximate cause of the damage, according to the defendants, was the negligence of the plaintiff.

The evidence establishes that the AGELOS MICHAEL, a vessel under the con of a qualified pilot, Ira Delesdernier, got under way from her anchorage in the Mississippi River early on the morning of May 16, 1973. Delesdernier and the master of the vessel checked the sides of the vessel to be certain that nothing protruded over the vessel's sides in anticipation of having to pass through narrow locks and a drawbridge en route to the bulk terminal wharf.

The vessel approached the plaintiff's wharf about 5:30 A.M. and was ordered by plaintiff to dock at Berth #1. Lighting conditions were such as not to impede the pilot, who had previously piloted many vessels (100–150) docking at the facility. Delesdernier was fully aware of the physical aspects of the dock and he stated that he could see the gantry crane located on the dock from 1000 feet away, even though judging distance was more difficult than if it had been full light. He testified that as his vessel approached the dock he noticed that the crane was in an up position and in that position he knew it protruded over the face of the wharf. He

saw no lights on the crane,[1] but noted that the crane was 12 to 14 feet out over the water. The crane was always out over the dock according to Delesdernier, and he had noted its position many times in his previous trips.

After noting the position of the crane, but prior to impact of the ship's boom with the crane, Delesdernier evidently stopped watching the overhanging crane, because he stated that the next thing that he noticed were sparks falling, a result, he said, of the impact of the ship's boom with an electrical conduit located on the gantry crane.

The apron of the crane was in an upright position, which was normal when the crane was not in use.[2] In this position, as shown by Exhibit P-1, the point of impact indicated at the foot[3] of the stairway leading to the control cab is about 16 feet[4] outboard the vertical beam extending from the top of the crane to a base 3 feet from the face of the wharf. Since that beam is 3 feet from the face of the wharf, the point of impact was about 13 feet outboard the face of the wharf. The pilot estimated the overhang to be 12–14 feet from the face of the dock. We do not credit the testimony of plaintiff's witness, John Wingerter, who estimated the overhang to be only 3–4 feet.

Charles W. Decker, the Chief of Permits and Statistics Branch of the Corps of Engineers, whose duty it now is to issue permits[5] for facilities like those of the plaintiff, testified that the plans submitted to the Corps of Engineers and approved by them for the bulk facility did not show the gantry crane. At the time the facility was built, Decker claimed that the slip was recessed, that the plans did not show any request for construction of a crane, and that under the circumstances he would have asked for the drawings of the crane so that it could have been determined whether the crane was a hazard to general navigation. Though it has been shown that a permit was issued for construction of the wharf, no evidence was offered to establish that the crane overhang was approved.

The testimony conflicts as to which boom struck the crane, as well as to the position of the offending boom. Plaintiff's witnesses said the second port boom struck the crane and that the boom was overhanging the ship's port side.[6] The pilot claimed the forward boom struck the crane while it was in a topped up forward position. Frass, a lineman on the wharf assigned to assist in tying up the vessel, testified all forward booms were hanging toward port,

---

1. There is testimony by Wingerter that the stairway lights on the crane are kept on for maintenance workers at night, as well as the aircraft warning light on the top of the gantry crane.

2. John Wingerter, Jr., testifying for plaintiff, stated that Exhibit P-1 shows dotted lines which indicate the position of the crane in its non-use position. There is testimony by Wilfred LeBauve to the effect that the boom can be drawn up to a completely vertical position and locked but we think that the evidence establishes that the boom was in the dotted line position when the vessel's boom struck the crane at the point marked on P-1.

3. It should be noted that in a down position, there is a stairway leading to the control cab for the use of the operator. In the up position, as shown by the dotted lines on P-1 and P-1a, the point of impact marked by Wingerter (P-1a), LaBauve (P-1b), Delesdernier (placed an X on P-1) are at the foot of the stairway leading to the control cab.

4. Using the scale shown in P-1 ($\frac{1}{8}''=1'$) we compute the actual horizontal distance between the point of impact and the vertical beam, nearest the edge of the water, to be 16 feet.

5. Decker had nothing to do with the issuance of the permit for building of the bulk terminal facility in 1959.

6. Plaintiff's witnesses also claimed that prior to the impact between the ship's boom and the gantry crane, the bow of the ship hit the shiploader located on the dock of the plaintiff. There is no creditable evidence that the vessel struck the shiploader nor is there any claim by the plaintiff for damage done to the shiploader.

but that none overhung the ship's side, and that it was the forward port boom which struck the crane.

We find that the forward port boom came into contact with the stairway leading to the crane's control cab at the point indicated by plaintiff's witnesses and the pilot on Exhibits P–1, P–1a and P–1b.

Considering our calculation that the crane overhung the water about 13 feet at the point of impact and the pilot's testimony that the port forward kingpost to which the port forward boom was attached was located about 20 feet inboard from the port side of the ship, and if the boom was topped up forward, as the pilot claimed, we find that this accident could not have occurred. Indeed the boom tip would have been about 10 feet outboard of the point of impact and about 8 feet outboard the maximum distance the crane cab overhung the water.

Our calculations of the 13 foot overhang, the pilot's estimate that the overhang was 12–14 feet, the linesman's testimony that the forward port boom was hanging to port and the evidence establishing the point of contact between the boom and the crane compel the conclusion that the boom was not topped forward as the pilot claimed, but was hanging to port to a sufficient degree to cause it to strike the crane as the ship moved forward. And the boom need not have overhung the ship's port side to have struck the crane. We believe the credible evidence establishes that the port forward boom did not overhang the ship's side, but was in a position about 10 feet toward port from the kingpost, which would have placed it a similar distance from the port gunwale.

■ We find that the 13 foot overhang over navigable waters of the crane owned by plaintiff created an obstruction to navigation in violation of 33 U. S.C. § 403. *See* City of Portland v.

Luckenbach Steamship Co., 217 F.2d 894, 898, 1955 A.M.C. 6 (9 Cir. 1954); F. S. Royster Guano Co. v. Outten, 266 F. 484 (4 Cir. 1920); United States v. Norfolk-Berkley Bridge Corporation, 29 F.2d 115, 128 A.M.C. 1636 (E.D.Va. 1928).

■ The plaintiff contends that this situation calls for the presumption of fault imposed under the "Pennsylvania Rule", The Pennsylvania, 86 U.S. (19 Wall) 125, 22 L.Ed. 148 (1873), against a moving vessel which strikes a stationary object. In support of this premise, plaintiff cites the following cases in his proposed conclusions of law: The Oregon, 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943, 949 (1895); The Clarita, 90 U.S. (23 Wallace) 1, 13, 23 L.Ed. 146, 150 (1874); Brown and Root Marine Operators, Inc. v. Zapata Off-Shore Co., 377 F.2d 724 (5 Cir. 1967); Patterson Oil Terminals, Inc. v. The Port Covington, 205 F.2d 694, 696 (3 Cir. 1953) and The Victor, 153 F.2d 200, 202, 203 (5 Cir. 1946). None of these cases involve an obstruction to navigation similar to the overhang of the plaintiff's gantry crane. In fact, none of these cases involve an obstruction of any type. The presumption of negligence per se that should be imposed when a moving vessel strikes a stationary object which is a hazard to navigation, is against the owner of the fixed object where the fixed object violates a law designed to prevent collisions. 33 U.S.C. § 403, American Zinc Co. v. Foster, 313 F.Supp. 671, 1972 A.M.C. 538 (S.D.Miss.1970), aff'd, 441 F.2d 1100, 1972 A.M.C. 536 (5 Cir. 1971). *See also* Patton Towing Company v. J. J. Spiller, 1969 A.M.C. 2136 (Tex.App.1969). The violation of this statute casts the burden on the plaintiff to show that its violation not only was not a contributing cause of the collision, but also that it could not have been.[7] The Pennsylvania, supra. The plaintiff has failed to meet the burden of going

7. For authorities applying the Pennsylvania Rule to situations where a vessel struck a stationary object, see The Fort Fetterman v. South Carolina State Highway Dept., 261 F.2d 563 (4 Cir. 1958) and the authorities cited therein at footnote 1, page 568.

forward with the evidence to show that its fault did not cause or contribute to the collision. In fact, there is no doubt that "but for" the 13 foot extension of the crane over the water, the accident would not have happened.

■ In addition to liability based upon the violation of 33 U.S.C. § 403, we find that the plaintiff was negligent in not moving the gantry crane to a location away from Berth #1 where it would have presented no danger to the vessel and, failing to move the crane, in not placing the vessel at a berth other than #1 if the crane was to remain where it was. We think the applicable principle was stated in Smith v. Burnett, 173 U.S. 430, 19 S.Ct. 442, 43 L.Ed. 756 (1899):

> "Although a wharfinger does not guarantee the safety of vessels coming to his wharves, he is bound to exercise reasonable diligence in ascertaining the condition of the berths thereat, and, if there is any dangerous obstruction, *to remove it,* or to give *due notice of its existence to vessels* about to use the berths." (Emphasis ours).

We find this negligence on behalf of the plaintiff to be a proximate cause of the damages suffered by the plaintiff.

■ Since Delesdernier was aware of the dangerous condition and obstruction presented by the plaintiff's overhanging crane and because he took no precautions to see that the crane was moved from the area in which he was to dock or ask to be berthed in another location where there was no such hazard and in proceeding without determining that the ship's booms were in position to clear the overhang, we find that Delesder-

nier's lack of ordinary care and prudence in light of a hazard which he knew existed was negligence and this negligence was also a proximate cause of the damages suffered by the plaintiff. The Caldy, 153 F. 837, 840, 841 (C.C.A. 4 1907).

■ While the wharf owner is bound to exercise reasonable care in ascertaining conditions of berths and would be obliged to remove dangerous obstructions, the vessel master may not carelessly run into a known danger. *See* Smith v. Burnett, supra, and cases discussed therein, 173 U.S. 430, 19 S.Ct. 443–445, 43 L.Ed. 756.

■ Since we find fault on behalf of the plaintiff and the vessel, the damages should be divided. Griffin on Collision, Section 245, pp. 558, et seq.; The Catherine, 17 How (58 U.S.) 169, 15 L.Ed. 233 (1855); Atlee v. Packet Co., 21 Wall (88 U.S.) 389, 22 L.Ed. 619 (1874).

Plaintiff contends that under the doctrine of last clear chance, it should be awarded recovery of its damages in full.

■ If there is in admiralty a doctrine of last clear chance as known in the civil law,[8] we do not believe the circumstances here warrant its application to allow plaintiff to avoid the consequences of its fault which we have found.

Having found mutual fault and defendants having claimed or proved no damages, judgment shall be entered herein in favor of plaintiff in the sum of $10,638.01 with interest from May 16, 1973, each party to bear its own cost.

This opinion shall constitute this Court's findings of fact and conclusions of law.

8. See Judge Wisdom's opinion in Cenac Towing Co. v. Richmond, 265 F.2d 466, 470–472 (5 Cir. 1959); Crawford v. Indian Towing Co., Inc., 240 F.2d 308 (5 Cir. 1957), cert. den., 353 U.S. 958, 77 S.Ct. 865, 1 L.Ed.2d 909 (1957); Petition of Kinsman Transit Co., 338 F.2d 708, 720 (2 Cir. 1964), cert. den., 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed. 963 (1965).